## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Rachel S. Corn, a Special Agent with the Federal Bureau of Investigation (FBI), Baltimore Division, Baltimore, Maryland, being duly sworn, depose and state as follows:

1.      I have been a Special Agent with the FBI since May 2006.  Since September 2006, I have primarily investigated federal violations concerning child pornography and the sexual exploitation of children.  I have gained experience through training in seminars, classes, and daily work related to conducting these types of investigations.  Specifically, I have received FBI Crimes Against Children training, FBI Innocent Images Online Undercover training, and FBI Peer-to-Peer Network Online Investigation training.  I have participated in the execution of numerous search warrants, of which the majority have involved child exploitation and/or child pornography offenses.  Many of the child exploitation and/or child pornography search warrants resulted in the seizure of computers, cell phones, magnetic storage media for computers, other electronic media, and other items evidencing violations of federal laws, including various sections of Title 18, United States Code § 2252A involving child exploitation offenses.  I have also participated in the execution of numerous search warrants for online accounts, such as email accounts, online storage accounts and other online communication accounts related to child exploitation and/or child pornography.  In the course of my employment with the FBI, I have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media and within online accounts.

2.      As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3.      This affidavit is made in support of an application for a warrant to search the following (hereinafter referred to as the "TARGET LOCATIONS"):

      a.      The Google account associated with ckbendann@gmail.com;

      b.      The Apple account associated with cbendann@gilman.edu;

      c.      The Microsoft account associated with cbendann@gmail.com;

      d.      The Microsoft account associated with cbendann@gilman.edu; and

      e.      The person of Christopher Kenji Bendann in order to retrieve buccal or oral swabs in sufficient quantities for scientific testing as it relates to deoxyribonucleic acid (DNA);

4.      The TARGET LOCATIONS are to be searched for evidence of violations of Title 18, United States Code, Section 2251(a) (sexual exploitation of children), Title 18, United States Code, Section 2422(b) (online coercion and enticement of a minor); Title 18, United States Code, Section 2252A(a)(2) (distribution and receipt of child pornography), and Title 18, United States Code, Section 2252A(a)(5)(B) (possession of child pornography) (the "TARGET OFFENSES").

5.      The statements in this affidavit are based in part on information and reports provided by the Baltimore County Police Department, other law enforcement agencies, on my investigation of this matter, and on my experience and background as a Special Agent of the FBI. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of the TARGET OFFENSES are located in the TARGET LOCATIONS.

**SUMMARY CONCERNING CHILD PORNOGRAPHY, PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY AND HOW USE OF COMPUTERS AND THE INTERNET RELATES TO THE POSSESSION, RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY**

6.      Based on my investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who utilize the internet to view and receive images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals, including the following:

a.      Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who have a sexual interest in children or images of children frequently maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer or cellphone, and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts or other online communication accounts, to enable the individual to view the collection, which is valued highly.

e.     Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  This data is typically in digital format, and often maintained on computers, cell phones and in online storage, email accounts or other online communication accounts.

f.     Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer to Peer networks and other online methods would have gained knowledge of its location through online communication with others of similar interest.  Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images.  Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g.     Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography.

7.     Based on my investigative experience related to computer and internet related

child pornography investigations, and the training and experience of other law enforcement

officers with whom I have had discussions, I have learned the following:

a.     Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  It has also revolutionized the way in which child pornography collectors interact with each other.  Child pornography formerly was produced using cameras and film (either still photography or movies.)  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  As a result, there were definable costs involved with the production of pornographic images.  To distribute these on any scale also required significant resources.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls.  Any reimbursement would follow these same paths.

b.     The development of computers, smartphones and the internet have added to the methods used by child pornography collectors to interact with and sexually exploit children.  Computers, smartphones and the internet serve four functions in connection with child pornography.  These are production, communication, distribution, and storage.

c.     Mobile devices such as laptop computers, smartphones, iPods, iPads and digital media storage devices are known to be used and stored in vehicles, on persons or other areas outside of the residence.

d.      Smartphones have the capability to access the Internet and store information, such as videos and images.  As a result, an individual using a smartphone can send, receive, and store files, including child pornography, without accessing a personal computer or laptop.  An individual using a smartphone can also easily plug the device into a computer, via a USB cable, and transfer data files from one digital device to another.  Many people generally carry their smartphone on their person.

e.      Child pornographers can now transfer photographs from a camera onto a computer-readable format.  With the advent of digital cameras, the images can now be transferred directly onto a computer.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.  The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.

f.      Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem.  Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

g.      The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.  Collectors and distributors of child pornography use online resources to retrieve and store child pornography, including services offered by Internet Portals such as AOL Inc., Yahoo, and Google, Inc., Facebook, Dropbox, Instagram, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services, file exchange services, messaging services, as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Email accounts, online storage accounts, and other online communication accounts allow users to save significant amounts of data, including email, images, videos, and other files.  The data is maintained on the servers of the providers, and is occasionally retained by the providers after the user deletes the data from their account.  Typically, when individuals search for and obtain files on the internet that depict the sexual abuse of minors, using cell phone, and other computer to visit internet websites, the electronic communications travel in and affecting interstate and even foreign commerce.

h.      In my recent investigative experience, as well as recent discussions with law enforcement officers, I know that individuals who collect child pornography are using email accounts, online storage accounts, and other online communications accounts to obtain, store, maintain, and trade child pornography with growing frequency, in addition to, or as an alternative to, the use of personal devices.

i.     Based on traits shared by collectors, the use of email, online storage accounts, and other online communication accounts, and the increased storage capacity of computers and server space over time, there exists a fair probability that evidence regarding the distribution, receipt and possession of child pornography will be found in the TARGET LOCATIONS notwithstanding the passage of time.

j.     In addition, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.

k.     When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

l.     In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.

m.     The storage capacity of personal computers has increased dramatically over the last few years.  Common and commercially available hard drives are now capable of storing over 500 GB of data.  With that amount of storage space, an individual could store thousands of video files and/or hundreds of thousands of image files.

n.     Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Since the storage capacity of hard drives has increased dramatically over the last several years, it is more likely that the above-described information will be recovered during forensic analysis.

## **GOOGLE**

8.     Google provides numerous free services to the users with a Google profile. Some of services include, Gmail, Google Hangouts, Google Wallet, Google+, Google Drive, Google Photos and Albums, and YouTube.  Gmail is a web-based email service that can also be accessed via mobile apps.  Gmail comes with 15GB of free storage and users can receive emails up to 50 megabytes in size, including attachments, while they can send emails up to 25 megabytes.  In order

to send larger files, users can insert files from Google Drive into the message.  Emails remain in an active Gmail account until deleted by the user.  Google Hangouts is a communication platform which includes instant messaging, video chat, and SMS and Voice Over IP (VOIP) features service that provides both text and voice communication.  Google Hangouts allows conversations between two or more users.  Chat histories are saved online, allowing them to be synced between devices. Google Wallet is a mobile payment system that allows its users to store debit cards, credit cards, loyalty cards and gift cards, among other things, on their mobile phones. Google+ is a social networking service.  Google Drive is a file storage and synchronization service, which provides users with cloud storage, file sharing, and collaborative editing.  Google Photos is an image hosting and sharing web service that allows users with a Google account to store and share images for free. YouTube is a free video sharing website that allows users upload, view and share videos.

## **APPLE**

9.      Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  The services include email, instant messaging, and file storage.

10.      iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

11.      iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any

Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices.  iWorks Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

12.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for Kik, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud.

## MICROSOFT

13.     A Microsoft Account is a single sign-on service that allows users to log into Microsoft websites, devices, services, and applications, such as Hotmail, Xbox Live, Messenger and OneDrive.  OneDrive, formerly known as SkyDrive, is a file hosting service that allows users to upload and sync files to a cloud storage and then access them from a Web browser or their local device.  OneDrive is part of a suite of online services offered by Microsoft and allows users to keep the files private, share them with contacts, or make them public.  Microsoft Corporation is unable to provide OneDrive content, Calendar and Address Book/Buddy list content pursuant to a date range.  Skype is a telecommunications application owned by Microsoft Corporation.  Skype provides video chat and voice calls between one or more computers, tablets, mobile devices, Xbox consoles and smartwatches.  Users can also exchange chat messages and share files.

## PROBABLE CAUSE

14.     On January 20, 2023, the Baltimore County Social Services Department became aware of an incident involving a teacher at the Gilman School located in Baltimore, Maryland. Social Services was advised that Christopher Bendann ("Bendann"), born in 1984, was terminated for employment on January 20, 2023, after reports were made that Bendann provided alcohol to students and then transported the students to the St. Paul's School, located on Falls Road, Baltimore County, Maryland, and Meadowood Regional Park, also located on Falls Road in Baltimore County, Maryland, and requested the students to remove their clothing and run around the location naked in front of him.  These incidents reportedly took place in the Summer of 2021.

15.     On January 26, 2023, Victim 1, born in 2005, was interviewed.  Victim 1 stated that Bendann previously was his middle school advisor.  Bendann also housesat/babysat for several Gilman families, to include Victim 1's family, when the parents of the students went out of town.

Victim 1 resided in Baltimore County, Maryland, when Bendann housesat/babysat for his family. Victim 1 stated that when he began high school, he and his friends began drinking, and Bendann allowed Victim 1 and his friends to drink.  Victim 1 stated that Bendann purchased alcohol for them, and in return they would do "naked laps."  Victim 1 described naked laps as the students removing all of their clothing and running around the park naked.  Victim 1 specifically recalled a time in September 2021, during the Maryland State Fair, when Bendann bought two cases of beer for Victim 1 and his friends.  They parked in a parking lot across the street from the Maryland State Fairgrounds and drank the beer.  Bendann dropped the students off at the State Fair and then later picked them up.  After picking them up, Bendann drove the students to Meadowood Regional Park in Baltimore County, Maryland.  Bendann told the students that they had to do "naked laps" for the beer.  Victim 1 said that two of his friends did the "naked laps" while Victim 1 watched. Afterwards, Bendann drove them back to Bendann's house and told them that they had to do the naked laps again.  This time another one of Victim 1's friends did the naked lap.  Victim 1 recalled that Bendann had a Ring doorbell camera on his porch, and he thought the camera captured this incident.

16.     As the interview continued, Victim 1 detailed a time when Bendann housesat at Victim 1's home in Baltimore County, Maryland in 2021.  Victim 1 explained that he had been drinking that day and attended a party with his friends.  Victim 1 contacted Bendann to pick him up from the party.  When they arrived at Victim 1's home, Victim 1 watched the show "Squid Games" on the sofa.  Victim 1 asked Bendann to make him food, and Bendann made Victim 1 scrambled eggs.  Victim 1 said that he ate the eggs and then "blacked out."  When Victim 1 woke up, he was naked in his bed with only the living room blanket covering his genitals.  Bendann told Victim 1 that Victim 1 was sleepwalking, jumping, and removed his own clothing.  Victim 1

indicated that he had only consumed 7 or 8 beers that evening and did not consume shots or liquor of any kind.  Victim 1 said that he did not believe that he consumed enough alcohol to render him as incapacitated as he had become.  Victim 1 also noted that Bendann did not eat any of the scrambled eggs.

17.     Victim 1 also advised that Bendann was "friends" with Gilman high school students on Instagram and Snapchat and also communicated with some students via text messaging.  Victim 1 provided Bendann's Instagram username as ckbenda and thought Bendann's Snapchat username was also ckbenda.  Victim 1 communicated with Bendann on Snapchat "a lot."  Victim 1 stated that he saw a screenshot of a Snap conversation which appeared to be Bendann asking Victim 1's friend to send a picture.  Victim 1 stated he thought the friend was to send a naked picture covering their private parts with their hands instead of running a naked lap.  Victim 1 does not know if a picture was sent.

18.     On January 30, 2023, Victim 2, born in March 2001, was interviewed and stated that when he was in 8th or 9th grade at Gilman, later determined to be in approximately 2016, Bendann gave him and his friends rides home after they had been drinking.  In exchange for the rides, Bendann made the students run around naked at Meadowood Park and the hill at St. Paul's.

19.     Victim 2 specifically recalled a time when Bendann drove approximately 40 minutes away to pick Victim 2 up from a party.  After, Bendann drove Victim 2 to get food from a McDonald's.  Bendann told Victim 2 that since it was such a long drive, Victim 2 "owed him." Bendann "forced" Victim 2 to get naked and touch his own penis.  Victim 2 sat in the passenger seat of Bendann's vehicle.  Victim 2 said that it stopped when Victim 2 ejaculated.  Victim 2 stated that he thought he was 15 or 16 years old during this incident.  This went on approximately every weekend for "awhile," and Victim 2 indicated that this lasted for approximately a year; then things

"started getting worse." Victim 2 touched himself the first few times in Bendann's car, and then Bendann began touching Victim 2's penis with his hand.

20. Victim 2 stated that similar incidents occurred at several different houses where Bendann housesat and also at Bendann's previous and current residence, both located in Maryland. Victim 2 continued that there were times when Bendann wanted Victim 2 to get in the shower at these homes. Bendann had Victim 2 masturbate his own penis, and at times Bendann photographed or video recorded these acts. On several occasions, Bendann also got naked and got in the shower and touched Victim 2's penis with his hand or mouth. Victim 2 stated there may be images or videos with Bendann touching Victim 2's penis with his hands.

21. Victim 2 did not recall how the pictures started, but eventually Bendann requested naked pictures from Victim 2. Victim 2 stated he thought he was 16 years old at the time the pictures started. Bendann reached out to Victim 2 on Snapchat and started "making deals" with Victim 2. Bendann threatened to expose Victim 2 if Victim 2 did not produce the requested photographs. As time went on, Victim 2 tried to block Bendann but Bendann started to harass Victim 2's friends and threatened to expose Victim 2 with the naked photographs. When requesting images from Victim 2, Bendann told Victim 2 how to pose and got mad if Victim 2 did not smile in the photographs. Victim 2 said that Bendann "made deals" with Victim 2 and told him that Victim 2 needed to send him a certain amount of naked photographs within a certain timeframe. Victim 2 estimated that he sent hundreds of videos and a thousand images of himself to include pictures and videos of himself naked, bending over, or masturbating. Victim 2 said that these images were sent to Bendann using the Snapchat App, and all of the images were screenshotted by Bendann. Victim 2 also shared that Bendann showed Victim 2 an Instagram account Bendann created with the username "fd_tch" which contained naked pictures of Victim 2.

Victim 2 said that he observed pictures of himself from when he was in high school, possibly in the 10th or 11th grade, and when he was in college. Bendann attempted to friend request Victim 2's friends using the account fd_tch but Victim 2's friends did not accept the request. Victim 2 stated that Bendann's Snap and Instagram usernames were ckbend or ckbenda.

22.     Victim 2 said that Bendann kept the images of Victim 2 on his phone in a hidden folder located in his camera roll. Victim 2 described Bendann's phone as being an iPhone.

23.     Victim 2 said he last saw Bendann during the Summer of 2022, and Bendann contacted him on approximately January 16, 2023, the day he was placed on administrative leave. Bendann asked if Victim 2 was the person who reported Bendann to the school. Bendann also stated to Victim 2 that he was "deleting everything."

24.     Victim 2 provided consent to search his cell phone. The following is a text message conversation between Victim 2 and the number 410-960-9562, which was saved as a contact in Victim 2's phone as "Mr. Bendann." The conversation occurred between December 7, 2022, and December 9, 2022, with my comments in brackets:

| | |
|---|---|
| Mr. Bendann: | [Victim 2's name] Boy |
| Mr. Bendann: | Puppy[1] fucking answer |
| Mr. Bendann: | [Victim 2's name] |
| Mr. Bendann: | Why does [Victim 2's friend] keep adding me |
| Mr. Bendann: | Puppy^ |
| Mr. Bendann: | Puppy respond |
| Mr. Bendann: | Puppets |
| Mr. Bendann: | Pup really? Snap back you are down to one a day and it is a big problem |
| Mr. Bendann: | Hey |
| Mr. Bendann: | Snap again |

25.     Victim 2 also provided consent to search his iPad. A text message conversation was located between Victim 2 and the number 410-960-9562, which was saved as a contact as

---

[1] I know through my training and experience, that "puppy" can refer to a person having power and control over another person within a sexual relationship.

"Mr. Bendann."  The conversation occurred between May 30, 2022, and December 10, 2022.

Below is an excerpt from the conversation starting on or about July 11, 2022, with my comments

in brackets:

| | |
|---|---|
| Victim 2: | You have until 12 noon tomorrow to apologize to me for the 5 years you forced me to do things that I did not want to do and the trauma that you caused me to have because of that. If I do not have an apology by then, I am going to cut off all communications. If I receive an apology then I will consider having you be a part of my life. |
| Mr. Bendann: | Cut me off |
| Mr. Bendann: | I'm going public |
| Mr. Bendann: | It's that simple |

***

| | |
|---|---|
| Mr. Bendann: | You started shit however long ago and <Victim's girlfriend> has you thinking it's all me, I'm going down but you are too |

***

| | |
|---|---|
| Victim 2: | I didn't do shit you sexually touched a 16 year old kid, then a year went by and you began to threaten me to do all these things because you didn't wanna lose me as your friend. It's time for you to fucking wake up and realize that. You forced several of my friends to get naked, I have every kid on my side because they have seen you do this stuff to others. You forget I have an iPad too, every single threat you have sent on snap text, I have taken a picture of. Every time you have said "you have to look happy" or "you have to say something" when you force me to send naked pictures and videos, I have pictures of those. You say that I took advantage of you for a little but you played that card for 4 years and threatened me so much for 4 years. I was an idiot that never told anyone about it. Before London, I finally felt okay to try to be friends, but you will never be okay with whatever friends we could be. You are a sick person that should be lucky that I haven't gone to the police. I have told you so many times I want to try to be your friend but you always try to ducking fight it. So yah I'm close to my ducking tipping point. If you want me to go away from that than you should try your hardest not to fucking flip shit on me every second of every day and stop threatening me to get naked. |
| Mr. Bendann: | Hahahahaha you think that's what you've got, sure but I have all the videos of you telling me to touch you and blow you, you forget that you started this shit, before I ever made you do anything you told me to do shut. |

| | |
|---|---|
| Mr. Bendann: | But good luck, also you think I give a fuck about what happens to me, you should know the minute this goes public I'm gone, and you can fucking deal with the cleanup. |
| Mr. Bendann: | I was fucking set to start over before London but you fucked shit with you're <Victim 2's girlfriend> of the year, funny how you always want a <Victim's 2 girlfriend>. |
| Mr. Bendann: | This is on you. |
| Victim 2: | It's all fun and games until you realize I was 16 in those videos. |
| *** | |
| Mr. Bendann: | But whatever I think we both know I'm screwed regardless. |

26.     On February 1, 2023, the Honorable Judge Karen A. Pilarski of the District Court of Maryland for Baltimore County, granted a search warrant for Bendann's person, vehicle (a 2009 Honda CRV, bearing Maryland tag 1AK6146), and residence, located at 115 Stanmore Road, Baltimore, Maryland.  On February 3, 2023, Baltimore County and FBI investigators executed the state search and seizure warrants.  The following is a list of the digital items seized during the search warrant (hereinafter referred to as the "TARGET DEVICES":

- *Asus laptop, Eee PC 1005PEB, s/n: A10AAS342113;*
- *Sony Vaio E Series Notebook, s/n: 3109183;*
- *Sony Cyber-shot digital camera, #6768470, with 2GB Sony Memory Stick Pro Duo, #E707L1L;*
- *Black and Orange Sony 8GB flash drive SDK-USM8GL(B) 10814MEEV2;*
- *Blue Lexar 8GB flash drive, LJDS50-8GB-000-103 Q 33444-8GBCD 3411S;*
- *Gray SanDisk 128GB flash drive, BP221157655W;*
- *Logitech flash drive, 810-000272;*
- *Apple iPhone model: A1549, IMEI: 354405069758749;*
- *White Apple iPhone and clear Gilman case;*
- *Apple iPhone 11 Pro, s/n: C39CK3CRN6XR ;*
- *Green and white Lexar 64GB flash drive, JDS75-64G-1000-108 F 30285-64GBGA 4315S;*
- *White Lexar 8GB flash drive, LJDS50-8GB-000-111 N 33668-8GBGC 1913S;*
- *White Lexar 16GB flash drive, LJDS50-16G-000-111 U 33863-16GNA 2113S;*
- *Black and White Lexar 8GB flash drive, LJDTT8GB-000-328 D 34137-8GBGA 2314S;*
- *Green and White Lexar 16GB flash drive, LJDTT16G-000-315 E 34207-16GBGA 2314S;*
- *Blue Dane-Elec 8GB flash drive;*
- *Dell Inspiron 15 laptop, service tag: HWSNXN2;*
- *Dell Inspiron 5150, service tag: 3BPV931*

27.     On February 3, 2023, Bendann was arrested and charged with Sexual Child Abuse, Second Degree Rape, Third Degree Sexual Offense, Fourth Degree Sexual Offense and Perverted Practice, all against Victim 2.  Bendann was initially held without bond and detained until February 21, 2023.

28.     On February 9, 2023, United States Magistrate Judge Beth P. Gesner, of the District of Maryland, issued search warrants (Case Nos. 23-0442-BPG, 23-0443-BPG, 23-0444-BPG, 23-0445-BPG, 23-0446-BPG) for the following:

     a.     Google account associated with cbendann@gmail.com;
     b.     Snap account associated with the phone number: 410-960-9562 and Username: ckbend;
     c.     Instagram accounts:
          1.     Username: ckbenda
          2.     Username: fd_tch
     d.     Apple account associated with cbendann@gmail.com; and
     e.     TARGET DEVICES

29.     A review of the search warrant results provided by Apple for the account associated with cbendann@gmail.com revealed numerous images and videos in the iCloud Photo Library. Below is a description of several videos located in a folder titled "Expunged[2]:"

     a.     A video, titled "IMG_6965.mov," depicts a minor male masturbating in what appears to be the passenger seat of a vehicle.  Exif data for the video indicates that the video was taken on September 16, 2017, using an iPhone 7.

     b.     A video, titled "IMG_6966.mov," depicts a minor male masturbating in what appears to be the passenger seat of a vehicle.  Exif data for this video indicates that the video was taken on June 21, 2018, using an iPhone 7.

---

[2] According to Apple, the Expunged folder is created through Apple's iCloud Photo Library file management process and is not a user created folder.  The Expunged folder contains files that were recently deleted by the user where either 30 days has passed since the file was placed into the Recently Deleted folder and then the file automatically moves to the Expunged folder or where a user deleted a file within the Recently Deleted folder and then the file moves immediately to the Expunged folder.  After a period of time the Expunged files will then be deleted through an automated process.

      c.     A video, titled "IMG_6967.mov," depicts a minor male masturbating in what appears to be the passenger seat of a vehicle.  Exif data for this video indicates that the video was taken on June 21, 2018, using an iPhone 7.

      d.     A video, titled "IMG_6974.mov," depicts a minor male masturbating in a shower.  Exif data for this video indicates that the video was taken on August 26, 2018, using an iPhone 7.

      e.     A video, titled "IMG_6969.mov," depicts Bendann washing a minor male in the shower to include touching the minor male's exposed penis.  Exif data for this video indicates that the video was taken on January 02, 2019, using an iPhone 7.

      f.     A video, titled "IMG_6976.mov," depicts Bendann washing a minor male in the shower to include touching the minor male's exposed penis.  Exif data for this video indicates that the video was taken on February 09, 2019, using an iPhone XS.

30.    A review of the search warrant results provided by Google for the account cbendann@gmail.com revealed over 55,500 emails.  The recovery email address was listed as **cbendann@gilman.edu**.  An email located in the search warrant results indicated that the user uploaded photos to their **OneDrive** in July 2020.

31.    During the forensic examination of the Dell Inspiron 15 laptop, an iTunes Backup File from the Apple iPhone 11 Pro was located.  Within the iPhone 11 iTunes Backup File were two screenshots, titled "IMG_5042.png" and "IMG_5043.png."  Below is a description of the two screenshots:

      IMG_5042.png – a screenshot of a Dell monitor screen depicting what appears to be Victim 2 touching another male's penis.

      IMG_5043.png – a screenshot of a male holding his erect penis in what appears to be the passenger seat of a vehicle.  A third hand is observed touching the first male's thigh.

32.     LNK[3] files were also located on the Dell Inspiron 15 laptop.  The location of two of the LNK files indicated that the actual files resided in the below path:

cbend\**OneDrive**\Pictures\Screen Record\New Folder\IMG_5042.png

cbend\**OneDrive**\Pictures\Screen Record\New Folder\IMG_5043.png

33.     The date time stamp for the LNK file associated with IMG_5042.png was 08/22/2022.  The date time stamp for the LNK file associated with IMG_5043.png was 02/16/2022.

34.     During the review of the forensic examination of the Apple iPhone 11 Pro, s/n: C39CK3CRN6XR the following email messages were located:

   a.      On August 20, 2021, and on April 18, 2022, two emails were sent from Instagram to **ckbendann@gmail.com** with the subject lines "Confirm your email on Instagram." Within the body of the emails, the emails stated "Hi fd_tch! You updated your email address to **ckbendann@gmail.com**."

   b.      On June 4, 2022, June 7, 2022, and June 11, 2022, three emails were sent from Instagram to **ckbendann@gmail.com** with the subject lines "An important update about your Instagram account settings."  Within the body of the emails, the emails stated "Hi fd_tch, You recently changed your Instagram account from private to public. This means anyone will be able to see your photos and videos…"

   c.      On June 22, 2022, an email was sent from Instagram to **ckbendann@gmail.com** with the subject line "New login to Instagram from Mobile Safari on Apple iPhone."  Within the body of the email, the email stated "We noticed a new login, fd_tch We noticed a login from a device you don't usually use. Apple iPhone · Mobile Safari · Syracuse, NY…"

   d.      On July 23, 2022, an email was sent from Instagram to **ckbendann@gmail.com** with the subject line "Your Instagram account is scheduled for deletion." Within the body of the email, the email stated "Hi fd_tch, We're sorry to see you requested to delete your account. If you change your mind, you have until August 22, 2022 to let us know…"

---

[3] LNK files are automatically generated by the Windows operating system when a file is accessed by the user.  LNK files are temporary files, which exist on the computer and track information about the location, or Windows path of the file being accessed.  Data in a LNK file is limited to the file name, file path, a date time stamp of when the LNK file was created (which is triggered by the actual file being opened by the user), and date time stamp of when the LNK file was last modified, which is triggered when the user opens the file again or changes its location.  Because there are a limited number of LNK files active at any time on a computer, LNK files work in a first-in-first-out sequence, automatically purging the oldest LNK file when a new file is opened.  LNK files can point to files not residing on the computer but instead where accessed from the computer.

  e. On July 25, 2022, an email was sent from Instagram to **ckbendann@gmail.com** with the subject line "Your account has been reactivated."  Within the body of the email, the email stated "Hi fd_tch, As you requested, your Instagram account has been automatically reactivated. To start using your account again, simply log in."

  35. On August 16, 2023, a grand jury sitting in the district of Maryland returned a six-count indictment charging Christopher Kenji Bendann ("Bendann") with Sexual Exploitation of a Child and Possession of Child Pornography (United States v. Christopher Kenji Bendann, JKB-23-0278).  On August 18, 2023, Bendann was arrested and was detained as a result of a detention hearing.  Bendann has remained detained since that date.

  36. Between September 6, 2023, and September 12, 2023, Baltimore County Police Department (BCPD) laboratory personnel examined a piece of fabric from the rear center seat of the 2009 Honda CRV, bearing Maryland tag 1AK6146, that was located at Bendann's residence during the residential search warrant executed on February 3, 2023. Spermatozoa were identified on the piece of fabric from the rear center seat. Test for the presence of seminal fluid in two stains were inconclusive.  Tests for the presence of seminal fluid on the remaining stains observed were negative.  Two swabs were used to sample the inconclusive stains and were packaged with the original item.  A slide generated from the swabs was packaged with the original item.  BCPD laboratory personnel advised that the case would not be forwarded for DNA analysis until known DNA samples are obtained from the victim(s) and suspect for comparison.

  37. BCPD laboratory personnel know from their training and experience, that the fluids and tissues of the human body, including saliva, contain DNA, a molecule found in most human cells that encodes an individual's unique genetic information.  With a few limited exceptions, the DNA sequences comprising an individual's genome – his or her complete genetic makeup – are identical across all of that individual's cells but totally unique within the population at large, that is, different from every other individual's.  DNA typing techniques commonly used in forensic

laboratories enable analysts to extract DNA from a sample, analyze the DNA sequences at several specified and standardized locations, and produce a set of DNA identification characteristics called a DNA profile. The number of locations and the variability in the DNA sequences that can be found there help ensure that a DNA profile matches only one individual. Thus DNA typing and comparing the resulting profile of an evidentiary sample to the profile of a reference sample are very powerful techniques for excluding or including an individual as the source of a biological fluid or tissue. In order to compare a DNA profile generated from body fluids or tissues associated with evidentiary materials to the DNA profile of an identified individual, a sample of bodily fluid or tissue containing DNA must be obtained from the latter. A buccal or oral swab – a minimally invasive and painless procedure whereby an individual's DNA sample is collected by applying a cotton swab or filter paper to the inside of that individual's cheeks or mouth – is one commonly used method for collecting such a DNA sample.

38.     BCPD laboratory personnel further advised that, in order to determine if Bendann's DNA matches any found on the vehicle, they will need a buccal/oral swab sample from the Bendann to serve as a reference sample. The laboratory will perform a direct comparison of DNA extracted from the reference sample to any DNA samples recovered from the vehicle mentioned above.

## TARGET ACCOUNTS

39.     Google provided the following information in response to administrative subpoena for the following account:

| | |
|---|---|
| Account: | **ckbendann@gmail.com** |
| Name: | Chris Bendann |
| Created On: | 05/03/2019 |
| Recovery SMS: | 410-960-9562 |

40.     Apple provided the following information in response to administrative subpoena for the following account:

| | |
|---|---|
| Apple ID: | **cbendann@gilman.edu** |
| DS ID: | 18109250225 |
| Account Type: | Full iCloud |
| Name: | Chris Bendann |
| Created On: | 09/18/2022 |
| Account Status: | Active |
| Verified Phone: | 410-960-9562 |

41.     Microsoft provided the following information in response to administrative subpoena for the following accounts:

| | |
|---|---|
| Account: | **cbendann@gmail.com** |
| Name: | Chris Bendann |
| Creation Date: | 07/12/2018 |
| Services Utilized: | OneDrive, Xbox, Skype |

| | |
|---|---|
| Account: | **cbendann@gilman.edu** |
| Name: | Chris Bendann |
| Creation Date: | 04/09/2018 |

## REQUEST TO EXECUTE WARRANT AT ANY TIME

42.     Because the warrants will be served on Google, Apple and Microsoft which will then compile the requested records at a time convenient to them, as well as devices already in the custody of law enforcement, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

## SUMMARY

43.     Based on the facts detailed above, as well as my training and experience, Bendann appears to have a sexual interest in children that includes producing images and/or videos of minor males engaged in sexually explicit conduct and saving the images and videos.  Further, Bendann maintains and controls a number of accounts for email, online storage and social networking.

44.     Based on my training and experience, as well as the activity detailed above, I believe that the user of the TARGET LOCATIONS are owned, possessed, and controlled by Bendann.  I also believe that the users/owners of the TARGET LOCATIONS (Bendann) display characteristics common to individuals who have a sexual interest in children, and who access with the intent to view and/or, possess, collect, receive, produce, and distribute child pornography as discussed in paragraphs 6 and 7 above.

45.     Based on these characteristics, and because the TARGET LOCATIONS that are the subject of this affidavit appear to be accessed, controlled, and/or created by Bendann, I respectfully submit there is probable cause that the TARGET LOCATIONS (1) contain evidence of production, distribution, receipt, and/or possession of child pornography, and (2) are relevant to determine the ownership and control of the TARGET LOCATIONS.  Based on my training and experience, such information may constitute evidence of the TARGET OFFENSES because the information can be used to identify the account's user or users.

## CONCLUSION

46.     Based on the foregoing information, I have probable cause to believe that contraband, and evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES as set forth herein and in Attachments B1 through B4, are currently contained in the TARGET LOCATIONS, more fully described in Attachments A1 through A4.  I therefore respectfully request that the search warrant be issued authorizing the search of the TARGET LOCATIONS for the items described above and in Attachments B1 through B4, and authorizing the seizure and examination of any such items found therein.

*Rachel S Corn*

Special Agent Rachel S. Corn
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with
Fed. R. Crim. P. 4.1 and Fed. R. Crim. P. 41(d)(3) this ___16th___ day of February, 2024.

Honorable Erin Aslan
United States Magistrate Judge
District of Maryland

### ATTACHMENT A1 - Google LLC

This warrant applies to information associated with the following Google account:

- ckbendann@gmail.com;

that is stored at premises owned, maintained, controlled, or operated by Google LLC, a business with offices located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## **ATTACHMENT A2 – Apple, Inc.**

This warrant applies to information associated with the following Apple account:

    - cbendann@gilman.edu;

that is stored at premises owned, maintained, controlled, or operated by Apple, Inc., a business with offices located at 1 Infinite Loop, Cupertino, California 95014.

## **ATTACHMENT A3 – Microsoft Corporation**

This warrant applies to information associated with the following Microsoft and Skype

accounts:

- cbendann@gmail.com**;**

- cbendann@gilman.edu;

that are stored at premises owned, maintained, controlled, or operated by Microsoft Corporation,
a business with offices located at 1 Microsoft Way, Redmond, Washington 98052.

## <u>ATTACHMENT A4 – DNA</u>

## DESCRIPTION OF LOCATION TO BE SEARCHED

The person of Christopher Kenji Bendann, date of birth xx/xx/1984, Social Security Number XXX-XX-1493.



## ATTACHMENT B1 – Google LLC

**I.      Files and Accounts to be produced by Google LLC between May 3, 2019, to the present.**

Google shall disclose responsive data, if any, by sending to the Federal Bureau of Investigation, 801 International Drive, 4th Floor, Linthicum, Maryland 21090, ATTN: Special Agent Rachel Corn, or rscorn@fbi.gov, using UPS or another courier service, notwithstanding 18 U.S.C. 2252A or similar statute or code.

To the extent that the information described in Attachment A1 is within the possession, custody, or control of Google LLC including any messages, records, files, logs, images, videos, or information that have been deleted but are still available to Google, Google is required to disclose the following information to the government for each account or identifier listed in Attachment A1:

### A.   Google Account Information

1.     Google account registration information, including name, user-specified contact information, recovery email address, recovery SMS number, account creation timestamp and IP address, and a list of Google services the account holder has enabled or accessed;

2.     Account change history IP addresses and associated timestamps;

3.     Google account login and logout IP addresses and associated timestamps;

4.     All means and sources of payment for all Google products and services (including complete credit or bank account numbers), and detailed billing records;

5.     All cookie and user-specific advertising data, including third-party cookies;

6.     All records pertaining to communications between Google and any person regarding the account, including contacts with support services and records of actions taken;

### B.   Gmail Account Information

7.     Gmail specific subscriber information, login and logout IP addresses and associated timestamps;

8.     Gmail specific non-content email header information, originating message IP addresses, and account settings;

9.     The contents of all e-mails, attachments and chat messages stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination e-mails sent addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

10.    Contents of all available deleted emails;

**C.  <u>YouTube Account Information</u>**

11.     YouTube specific subscriber information, including date of birth and country;

12.     YouTube specific login and logout IP addresses and associated timestamps;

13.     YouTube video upload IP addresses and associated timestamps;

14.     Copies of all publicly available videos;

15.     Copies of all private videos and associated video information;

16.     Copies of all private messages;

17.     All Channel or Video comments;

18.     All contacts;

**D.  <u>Google Voice Account Information</u>**

19.     Voice specific subscriber information, including signup IP and associated timestamp and user-provided name;

20.     Most recent 28 days of call and text logs;

21.     All account settings and account change history;

22.     Contents of all voicemail messages and text messages;

**E.  <u>Blogger Account Information</u>**

23.     Blogger specific subscriber information, including Blog registration information, Blog creation IP and timestamp, Blog owner/admin subscriber information, and post or comment owner information;

24.     All contents of private blog posts and comments;

**F.  <u>Google+ Account Information</u>**

25.     Google+ specific subscriber and IP address information, including associated timestamps;

26.     All IP addresses and timestamps associated with Posts, Comments, or Photos;

27.     All Content/Activity Stream, including posts, comments, and photos;

28.     All contacts/Circles;

29.     Google+ Profiles;

**G.  Android Account Information**

30.  Android specific subscriber and IP address information, including associated timestamps;

31.  All device IDs, IMEIs, and MEIDs associated with the target account(s);

32.  Timestamps, including device registration, first check-in, and last check-in;

33.  All Google accounts tied to the Android device(s) if any;

34.  Android hardware information;

35.  Cell carrier/service provider;

36.  All apps downloaded to the device;

**H.  Photos Account Information**

37.  Photos specific subscriber and IP address information, including associated timestamps;

38.  All upload IP addresses and associated timestamps;

39.  Contents of all Photos and Albums, including all exif data included by the user as part of the upload;

**I.  Drive Account Information**

40.  Drive specific subscriber and IP address information, including associated timestamps;

41.  All upload IP addresses and associated timestamps;

42.  All Drive content, including Docs, Sheets and Slides;

**J.  Google Accounts Linked by Cookies**

43.  All accounts linked to the accounts in Attachment A1, including accounts linked by Google or third-party cookies, SMS number, Internet Protocol Address, secondary or recovery emails, or other account-linking methods available to Google, and to any accounts for which the accounts in Attachment A1 are the secondary or recovery email address;

**K.  Google Location and Search History Information**

44.  All location history with associated timestamps.

45.  All search history and associated timestamps, including all "clicks" and "queries;"

**K. <u>Google Hangouts Account Information</u>**

46.     Hangouts specific subscriber and IP address information, including associated timestamps;

47.     Hangouts specific non-content transactional information for all text, audio, and video communications, including originating message IP addresses, and account settings;

48.     The contents of all Hangouts messages and attachments including images, videos and related timestamps and IP address logs;

**II.     Information to be Seized by Law Enforcement Personnel**

a.     Any and all records that relate in any way to the Google accounts described in Attachment A1 which is evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. § § 2251(a), 2422(b), 2252A(a)(2), and 2252A(a)(5)(B), specifically that relate to the following:

1.     Images, videos and other files depicting the production, distribution, receipt, possession of or access with intent to view child erotica, child pornography, the sexual exploitation of minors, sexually explicit conduct, and illicit sexual conduct;

2.     Communications or documentations regarding the production, distribution, receipt, possession of or access with intent to view child erotica, child pornography, the sexual exploitation of minors, sexually explicit conduct, and illicit sexual conduct;

3.     Communication or documentation regarding access to and/or interaction with minors, to include the enticement of a minor;

4.     Images depicting the interior or exterior of residences, public establishments, and vehicles;

5.     All images, messages, communications, calendar entries, and contacts, including any and all preparatory steps taken in furtherance of these crimes;

6.     Communication, information, documentation and records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts;

7.     Evidence of the times the account or identifier listed on Attachment A1 was used;

8.     All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

9.     Passwords and encryption keys, and other access information that may be necessary to access the account or identifier listed on Attachment A1 and other associated accounts;

10.     Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the subject account;

b.     All existing printouts from original storage which concern the categories identified in subsection II.A; and

c.     All "address books" or other lists of contacts.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.

If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.

## ATTACHMENT B2 – Apple, Inc.

I.      **Files and Accounts to be produced by Apple Inc. between September 18, 2022, to the present.**

        To the extent that the information described in Attachment A2 is within the possession, custody, or control of Apple including any messages, records, files, logs, images, videos, or information that have been deleted but are still available to Apple, Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A2:

        a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, methods of connecting, and means and source of payment (including any credit or bank account numbers);

        b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

        c.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

        d.      The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

        e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud

Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWorks (including Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

  f.  The activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), messaging logs (including iMessage, SMS, and MMS messages), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find my iPhone logs, logs associated with iOS device activation and upgrades, and logs associated with web-based access of Apple services (including all associated identifiers);

  g.  All records and information regarding locations where the account was accessed, including all data stored in connection with Location Services;

  h.  All records pertaining to the types of service used;

  i.  All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken;

  j.  All device registration information, all customer service records, all iTunes records, all Apple retail store transactions, all Apple online store transactions, all Apple and iTunes gift card transactions, all iCloud subscriber information, mail logs, and other transactional data, all Find My iPhone connection logs and transactional activity, all Apple device MAC addresses, all Apple Game Center connection logs and transactional records; all iOS device activation records; all Dual SIM, nano SIM, and eSIM records and carrier information, all Apple account sign-on and connection logs, all My Apple ID and iForgot connection logs and transactional records, and all iMessage capability query logs;

  k.  All accounts linked to the accounts listed in Attachment A2, including accounts linked by Apple or third-party cookies, SMS number, or secondary or recovery emails, or other account-linking methods available to Apple, and to any accounts for which the accounts in Attachment A2 are the secondary or recovery email address;

  l.  All location history with associated timestamps;

  m.  All search history with associated timestamps;

  n.  All accounts linked to the accounts in Attachment A2, including accounts linked by Apple or third-party cookies, SMS number, Internet Protocol Address, secondary or recovery emails, or other account-linking methods available to Apple, and to any accounts for which the accounts in Attachment A2 are the secondary or recovery email address.

## II.  Information to be Seized by Law Enforcement Personnel

a.      Any and all records that relate in any way to the Apple accounts described in Attachment A2 which is evidence, fruits, and instrumentalities of violations of Title 18 U.S.C.§ § 2251(a), 2422(b), 2252A(a)(2) and 2252A(a)(5)(B), specifically that relate to the following:

1.      Images, videos and other files depicting the production, distribution, receipt, possession of or access with intent to view child erotica, child pornography, the sexual exploitation of minors, sexually explicit conduct, and illicit sexual conduct;

2.      Communications or documentations regarding the production, distribution, receipt, possession of or access with intent to view child erotica, child pornography, the sexual exploitation of minors, sexually explicit conduct, and illicit sexual conduct;

3.      Communication or documentation regarding access to and/or interaction with minors, to include the enticement of a minor;

4.      Images depicting the interior or exterior of residences, public establishments, and vehicles;

5.      All images, messages, communications, calendar entries, and contacts, including any and all preparatory steps taken in furtherance of these crimes;

6.      Communication, information, documentation and records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts;

7.      Evidence of the times the account or identifier listed on Attachment A2 was used;

8.      All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

9.      Passwords and encryption keys, and other access information that may be necessary to access the account or identifier listed on Attachment A2 and other associated accounts;

10.     Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the subject account;

b.      All existing printouts from original storage which concern the categories identified in subsection II.A; and

c.      All "address books" or other lists of contact.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored

information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.

If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.

## ATTACHMENT B3 – Microsoft Corporation

**I.       Files and Accounts to be produced by Microsoft Corporation.**

To the extent that the information described in Attachment A3 is within the possession, custody, or control of Microsoft Corporation including any messages, records, files, logs, images, videos, or information that has been deleted but is still available to Microsoft Corporation, Microsoft Corporation is required to disclose the following information to the government for each account or identifier listed in Attachment A3:

a.       OneDrive files created, accessed or owned by the accounts listed in Attachment A3;

b.       Azure files created, accessed or owned by the accounts listed in Attachment A3;

c.       All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, member profile, and files;

Responsive Data from April 9, 2018, to the present:

d.       The contents of all e-mails, attachments and chat messages stored in the accounts described in Attachment A3, including copies of e-mails sent to and from the account, draft e-mails, the source and destination e-mails sent addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

e.       All existing printouts from original storage of all of the electronic mail described above in Section I.c. above;

f.       All internet search data including all queries and location data;

g.       All transactional information of all activity of the electronic mail addresses described above in Section I.c, including log files, dates, times, methods of connecting, ports, dial ups, and/or locations;

h.       All records or other information regarding the identification of the account described above in Section I.c, to include registration details, full name, physical and/or billing address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, all screen names associated with subscribers and/or accounts, all account names associated with the subscriber, methods of connecting, log files, means and source of payment (including any credit or bank account number), and detailed billing records;

i.       All records indicating the services available to subscribers of the electronic mail address described above in Section I.c.;

j.      All images, videos and other files, and associated upload/download date and timestamp, including all available metadata concerning these files associated with the accounts listed in Attachment A3;

k.      All records pertaining to communications between Microsoft and Skype and any person regarding the account, including contacts with support services and records of actions taken;

l.      All profiles and screen names associated with the accounts listed in Attachment A3;

m.      Payment information, including billing address, shipping address, and payment instruments, associated with any Microsoft services used by the accounts listed in Attachment A3;

n.      Messenger conversation logs, messages, and files shared associated with the accounts listed in Attachment A3, to include a complete list of all users communicating via Messenger with the accounts listed in Attachment A3;

o.      Skype Number Service History with list of Skype number(s) subscribed to by the accounts listed in Attachment A3;

p.      Skype Out Records, to include historical call detail records for calls placed to the public switched telephone network (PSTN);

q.      Skype Number Records, to include historical call detail records for calls received from PSTN;

r.      Skype SMS Records, to include historical SMS detail records;

s.      Skype email and password records, to include historical records of email and password change activity;

t.      Skype contact/buddy list for the accounts listed in Attachment A3;

u.      Skype chat/media content, to include any images, videos, and other files sent and received, for the accounts listed in Attachment A3;

v.      Skype IP logs for the accounts listed in Attachment A3;

w.      Xbox conversation logs, messages, and files shared associated with the accounts listed in Attachment A3, to include a complete list of all users communicating via Xbox with the accounts listed in Attachment A3;

x.      All communication to or from the user/subscriber of the account, including communication regarding the status of the account;

y.      All Microsoft and Skype accounts linked to any of the accounts listed in Attachment A3 which are linked by machine or third-party cookies, email address, IP address, telephone number, or other account-linking methods available to Microsoft, and all the previously requested data for the additional accounts linked to the accounts listed in Attachment A3;

z.      All location history with associated timestamps;

aa.     All search history with associated timestamps.

## II.      Information to be seized by Law Enforcement Personnel:

a.      Any and all records that relate in any way to the Microsoft accounts described in Attachment A3 which is evidence, fruits, and instrumentalities of violations of production, distribution, receipt, and possession of child pornography in violation of 18 U.S.C. § § 2251(a), 2422(b), 2252A(a)(2) and 2252A(a)(5)(B), specifically that relate to the following:

1.      Images, videos and other files depicting the production, distribution, receipt, possession of or access with intent to view child erotica, child pornography, the sexual exploitation of minors, sexually explicit conduct, and illicit sexual conduct; Communications or documentations regarding the production, distribution, receipt, possession of or access with intent to view child erotica, child pornography, the sexual exploitation of minors, sexually explicit conduct, and illicit sexual conduct; Communication or documentation regarding access to and/or interaction with minors, to include the enticement of a minor; Images depicting the interior or exterior of residences, public establishments, and vehicles;

2.      All images, messages and communications, including any and all preparatory steps taken in furtherance of these crimes;

3.      Communication, information, documentation and records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts;

4.      Evidence of the times the account or identifier listed on Attachment A3 was used;

5.      All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

6.      Passwords and encryption keys, and other access information that may be necessary to access the account or identifier listed on Attachment A3 and other associated accounts;

7.      Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the subject account;

b.      All existing printouts from original storage which concern the categories identified in subsection II; and

c.      All "address books" or other lists of contacts.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.

If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

## **ATTACHMENT B4 – DNA**

A sample of the deoxyribonucleic acid ("DNA") of the individual listed in attachment

A4, to be collected via a buccal or oral swab in accordance with established procedures and to be

analyzed forensically in accordance with the applicable valid established procedures.